


**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 19, 2024

**BY ECF**

The Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United States v. Luis Robles*, 24 Cr. 87 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for September 26, 2024. The defendant, Luis Robles, faces a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range of 151 to 188 months' imprisonment. For the reasons set forth below, the Government submits that a sentence of between 97 and 121 months—which is within the defendant's Guidelines range if the Guideline for powder cocaine, instead of crack cocaine, were applied—is fair and appropriate.

    I.    **Offense Conduct**

    The charges against Luis Robles, arise out of an investigation conducted by the New York City Police Department's (the "NYPD") Bronx Borough Narcotics Unit ("Bronx Narcotics"). (PSR ¶ 14). Between in or about February 2023 and September 2023, Bronx Narcotics sent an undercover officer (the "UC") into the Fordham Heights area of the Bronx—around 182nd and 183rd Street between Morris Avenue and Creston Avenue—to purchase drugs from several individuals dealing narcotics in that area. (PSR ¶ 15).

    The UC made seven separate buys into Robles from February 2023 through April 2023. Across those buys, the UC purchased from Robles approximately (i) 12 oxycodone pills, (ii) 221 grams of cocaine, and (iii) 48 grams of fentanyl. (PSR ¶ 16). He also purchased two firearms. (*Id.*). During the final buy, which is when the UC purchased over 40 grams of fentanyl at one time, Robles called co-defendant Jose Valdez in front of the UC and told the UC that Valdez—who Robles referred to as "Bombo"—was the person responsible for getting the UC's fentanyl. (*Id.*). Then, a few minutes later, Valdez appeared where the UC and Robles were located and provided a package of fentanyl to Robles, which Robles, in turn, gave to the UC in front of Valdez. (*Id.*).

### A. The Undercover Buys

The first buy took place on or about February 17, 2023 inside of the main entrance of 111 East 182nd Street in the Bronx, where Robles lives with his mother. During this buy, the UC obtained 5 oxycodone pills from Robles for $100. (PSR ¶ 17). The pills were tested at the NYPD's laboratory and came back positive for oxycodone. (*Id.*).

The second buy took place on or about February 22, 2023 also inside of the main entrance of 111 East 182nd Street. (PSR ¶ 18). During this buy, the UC obtained 15 capsules of cocaine (approximately 0.516 grams) and 5 more oxycodone pills from Robles for $160. (*Id.*) The drugs were tested at the NYPD's laboratory and came back positive for cocaine and oxycodone, respectively. (*Id.*)

The third buy took place on or about March 1, 2023 inside the UC's car in the vicinity of 2188 Creston Avenue, which is the building where Valdez lives. (PSR ¶ 19). During this buy, the UC obtained 7 more capsules of cocaine (approximately 0.429 grams) and 2 more oxycodone pills from Robles for $70. (*Id.*) In addition, Robles told the UC that he (Robles) could get the UC a firearm for $700, if the UC was interested. (*Id.*) The UC agreed to buy the gun. (*Id.*) Robles left the UC's car and went inside of 2188 Creston Avenue. (*Id.*) A few minutes later, Robles came out of 2188 Creston, got back inside of the UC's car, and provided the UC with a 9mm handgun, 5 bullets, and a magazine in exchange for $700. (*Id.*) The drugs were tested at the NYPD's laboratory and came back positive for cocaine and oxycodone, respectively. (*Id.*)

The fourth buy took place on or about March 7, 2023 also inside the UC's car in the vicinity of 2188 Creston. (PSR ¶ 20). During this buy, the UC obtained approximately 59 grams of cocaine from Robles for $2,100. (*Id.*). Yet again, Robles told the UC that he (Robles) could get the UC another firearm for $700, if the UC was interested. (*Id.*). The UC agreed to buy this gun too. (*Id.*). The UC let Robles out of the car, went to obtain more money, and then came back for Robles. (*Id.*). When Robles was in the UC's car again, Robles provided the UC with a 9mm handgun, 5 bullets, and a magazine in exchange for $700. (*Id.*). The drugs were tested at the NYPD's laboratory and came back positive for cocaine. (*Id.*).

The fifth buy took place on or about March 16, 2023 also inside of the main entrance of 111 East 182nd Street. (PSR ¶ 21). During this buy, the UC obtained approximately 60 grams of cocaine from Robles for $2,100. The drugs were tested at the NYPD's laboratory and came back positive for cocaine. (*Id.*).

The sixth buy took place on or about April 1, 2023 inside the UC's car in the vicinity of 2164 Creston Avenue, near Valdez's apartment. (PSR ¶ 22). During this buy, the UC obtained from Robles approximately 100 grams of cocaine for $3,300 and approximately 3 grams of fentanyl as a sample. (*Id.*). During this exchange, Robles told the UC that the sample was "fetty" and that the UC should be careful with the "fetty," acknowledging the dangers of fentanyl. (*Id.*). The drugs were tested at the NYPD's laboratory and came back positive for cocaine and fentanyl, respectively. (*Id.*).

The seventh and final buy took place on or about April 8, 2023 inside the UC's car in the vicinity of 2188 Creston Avenue, outside of Valdez's apartment building. (PSR ¶ 23). The UC obtained approximately 45 grams of fentanyl from Robles and Valdez in exchange for $2,000. (*Id.*). During this buy, the UC drove to the vicinity of 2188 Creston Avenue to obtain fentanyl from Robles. (*Id.*). While the UC was waiting with Robles for the drugs, the UC observed Robles make a phone call to a person Robles said was "Bombo." (*Id.*). Robles told the UC that "Bombo" was the person responsible for setting up the UC's fentanyl buy. (*Id.*). A little while later, Valdez showed up and gave Robles the package of fentanyl. (*Id.*). Robles then got into the UC's car and provided the UC with the package of fentanyl in exchange for cash. (*Id.*).

While inside the car with Robles, the UC opened the package of Fentanyl to examine the drugs. (PSR ¶ 24). Because the Fentanyl was not packaged correctly, several grams of fentanyl were dispersed inside of the UC's car. (*Id.*). The UC complained to Robles about the poor packaging and lost product. (*Id.*). A few minutes after that, Valdez reappeared. (*Id.*). The UC also complained to Valdez about the fentanyl. (*Id.*). In response, Valdez told the UC that he was going to talk to the person who provided the fentanyl and tell that person that that person owed the UC 5 grams. (*Id.*). Valdez then got on the phone with another person and discussed the fentanyl in Spanish. (*Id.*). After getting off the call, Valdez indicated to the UC that he should contact Robles—whom he called "Chubb"—to get the situation remedied. (*Id.*). The drugs were tested at the NYPD's laboratory and came back positive for fentanyl. (*Id.*).

### B. The Search of Robles's Apartment

On or about February 21, 2024, on the day that Robles was arrested on these charges, officers from the NYPD executed a judicially-authorized search warrant at Robles's Apartment. (PSR ¶ 27). During that search, NYPD officers found the following: (i) $45,580 in cash; (ii) a Colt .38 caliber revolver and five .38 caliber bullets; (iii) approximately 248.47 grams of crack cocaine; and (iv) approximately 159.19 grams of fentanyl. (*Id.*).

### C. The Search of Valdez's Apartment

Also, on or about February 21, 2024, the day that Valdez also was arrested on these charges, officers from the NYPD executed a judicially-authorized search warrant at Valdez's Apartment. (PSR ¶ 28). During that search, NYPD officers found the following: (i) $6,799 in cash; (ii) approximately 94 .22 caliber bullets, (iii) approximately 6 .38 caliber bullets, (iv) approximately 395.33 grams of crack cocaine; (v) approximately 9.463 grams of fentanyl; and (vi) and substantial drug packaging paraphernalia including a scale, twist bags, razor blades, and Ziplock bags full of empty vials. (*Id.*).

### II.   Guilty Plea and Applicable Guidelines Range

On February 14, 2024, the defendant was charged in a six-count Indictment with one count of conspiring to distribute and possess with intent to distribute (i) 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 841(b)(1)(B) and 846, and (ii) mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846;

one count of distributing and possessing with intent to distribute (i) 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(B), and (ii) mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C); two counts of distributing and possessing with intent to distribute mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C)[1]; and two counts of possessing a firearm in furtherance of a narcotics offense, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) and 2.  (PSR ¶¶ 1-7).

On June 18, 2024, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to the lesser-included offense as charged in Count One of the Indictment. (PSR ¶ 10). The Plea Agreement between the parties stipulated to a base offense level of 32, as the offense involved nearly 216 grams of fentanyl and 864 grams of cocaine base. (*Id.* ¶ 10(c)). Four additional levels were added to the offense level because a firearm was possessed and because the defendant maintained a premises for the purpose of distributing narcotics, making the adjusted offense level 36. (*Id.* ¶¶ 10(e) and (f)). Factoring in acceptance of responsibility, the total offense level is 33. (*Id.* ¶ 10(h)). With a criminal history category of II, the Stipulated Guidelines Range is 151 to 188 months' imprisonment. (PSR ¶ 10(i) and (j)).

The Probation Office disagrees with that calculation. It calculates the defendant's applicable Guidelines range as 168 to 210 months' imprisonment rather than 151 to 188 months' imprisonment because it concludes that the defendant's criminal history category is III rather than II. (*See* PSR ¶ 78). This discrepancy arises out of the Probation Office's inclusion of a 2016 criminal conviction for criminal possession of a weapon in the second degree, for which the defendant was adjudicated a youthful offender and of which the parties were not aware at the time they entered into the Plea Agreement. While the Probation Office's calculation appears to be accurate based on the information presently available to the Government, the Government considers itself bound by the Guidelines calculation contained in the Plea Agreement. Notwithstanding its belief that a higher Guidelines range applies to the defendant, the Probation Office recommends a sentence 96 months' imprisonment. (PSR at p. 23).

### III.    Discussion

#### A. *Applicable Law*

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The

---

[1] One of those counts also charged the defendant with distributing and possessing with intent to distribute mixtures and substances containing a detectable amount of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [in the Guidelines];
(5) any pertinent policy statement [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B. A Sentence Within the Powder Cocaine Guideline Range of 97 to 121 Months Is Appropriate

On December 16, 2022, the Department of Justice issued a new policy regarding charging, pleas, and sentencing in drug cases (the "Drug Cases Memo"). In order to eliminate the crack-to-powder cocaine sentencing disparity, and pursuant to the Drug Cases Memo, at sentencing in crack cocaine cases, prosecutors "should advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine" and "[w]here a court concludes that the crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity of powder cocaine."

Accordingly, although the Plea Agreement reflects the stipulated Guidelines range of 151 to 188 months' imprisonment, the Government respectfully requests that the Court sentence the defendant consistent with the Guidelines range for powder cocaine. Here, the defendant would be

responsible for at least 700 kilograms but less than 1,000 kilograms of converted drug weight, which results in a base offense level of 28, pursuant to U.S.S.G. § 2D1.1(c)(12). Based on the applicable Guidelines enhancements and reductions described in the Plea Agreement, and the defendant's criminal history (which the Government is bound to calculate as category II), the resulting advisory Guidelines range would be 97 to 121 months' imprisonment. A sentence within this range is appropriate, based on the nature and seriousness of the offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of the defendant's conduct supports a substantial term of imprisonment. As the Court is aware, fentanyl is a particularly dangerous substance, where even small amounts can prove to be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[2] The crisis has only worsened. In 2023, for the first time in U.S. history, the overdose death rate topped 112,000 in a 12 month period, according to the Center for Disease Control and Prevention, with young people and people of color among the hardest hit.[3] Drug policy experts and people living with addiction say the magnitude of this calamity now eclipses every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[4]

As described above, the defendant distributed approximately 48 kilograms of fentanyl to the UC and possessed with the intent to distribute approximately 160 more grams of fentanyl. That is a substantial volume of poison being distributed in the New York City area, which likely would have been sold to the public had it not been purchased by law enforcement or had the defendant not been arrested. Moreover, the fact that law enforcement officers found over $45,000 in cash inside of the defendant's apartment during a search of that premises indicates that the defendant deals narcotics in very large quantities to individuals other than the UC. Thus, there is little question that the offense at issue was extremely serious and potentially lethal to many New Yorkers. A substantial term of imprisonment is necessary to adequately reflect the gravity of the defendant's conduct and to afford adequate deterrence to the defendant and other would-be fentanyl traffickers.

In addition, the defendant offered to and did sell the UC two firearms and ammunition during his narcotics transactions. He also possessed a third firearm and ammunition inside of his

---

[2] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text=Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022.

[3] https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction#:~:text=In%202023%20the%20overdose%20death,for%20Disease%20Control%20and%20Prevention

[4] *Id.*

residence alongside his stash of narcotics and cash. It stands to reason that the defendant intended either to sell that third firearm to someone or to use it to protect his narcotics stash and cash. Either way, the defendant's possession and sale of firearms and ammunition is an aggravating factor that further supports the conclusion that a substantial sentence is necessary to promote respect for the law and to provide just punishment for the totality of the defendant's conduct.

The defendant, meanwhile, asks the Court to sentence him to only four years in prison, which is significantly below even the powder cocaine Guideline Range of 97 to 121 months' imprisonment. He argues for that inappropriately low sentence primarily because he had a difficult upbringing, because he has faced harsh conditions at the Metropolitan Detention Center Brooklyn (the "MDC"), and because, as the defendant himself put it in his sentencing submission, he is just "a street dealer," rather than "a person who dictates crime." The defendant is wrong, and the Court should reject his recommendation.

First, the defendant's difficult upbringing is not a mitigating factor that justifies a below Guidelines sentence of four years' imprisonment. While the defendant's difficult childhood is sad in many ways, his conduct in this case perpetuated the destructive effects that plagued his own childhood. Rather than turn away from the drugs and guns he claims to have experienced growing up, the defendant became a gun and drug dealer who is responsible for putting other kids growing up in his neighborhood (just like the kid he once was) in danger. The defendant's upbringing cannot justify the harm he inflicted on others, and a significant sentence of between 97 and 121 months is necessary to protect the public from his criminal behavior and the criminal behavior of others.

Second, the defendant's argument that one of the mitigating factors in this case is the conditions of his confinement at the MDC also fails to justify his recommended sentence. While the MDC has, at times, had significant challenges, the Government does not agree that the conditions are inhumane, as the defendant claims. While the defendant complains about frequent "lockdowns," among other things, he was not incarcerated at the MDC in 2020 or 2021, at the height of the COVID-19 pandemic where there were far more frequent lockdowns. In any event, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020).

Third, the defendant's suggestion that he is not all that culpable because he was just a small-time drug dealer is inconsistent with the facts. In his sentencing submission, the defendant makes numerous statements downplaying his own culpability. For example, the defendant claims that "[h]e is a street dealer" (Def. Submission at 7); that "he is not a person who dictates crime, (*id.*); that "he did not decide on the amount of narcotics being sold his customer does," (*id.*); and that he "had no role in deciding how much narcotics was to be involved. This fact was determined solely by the undercovers," (*id.* at 11). Each of those statements, and other like them, are contradicted by the facts. The defendant did more than just sell narcotics to one UC. He offered to sell and then sold the UC two firearms and ammunition. In addition, the quantity of drugs found in his apartment at the time of his arrest dwarf the quantity of narcotics he sold to the UC. Specifically, at the time of his arrest almost a full year after he sold drugs to the UC, he was found in possession of (i) $45,580 in cash; (ii) a Colt .38 caliber revolver and five .38 caliber bullets; (iii) approximately 248.47 grams of crack cocaine; and (iv) approximately 159.19 grams of

fentanyl.  The defendant is a very serious drug and gun dealer, and his sentence must reflect the severity of his conduct.

### IV.     Conclusion

For the reasons set forth above, a sentence within the powder cocaine Guideline of 97 to 121 months' imprisonment would be sufficient but not greater than necessary in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Matthew J. King
Assistant United States Attorney
(212) 637-2384